UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| MISTY N. HEIL, | ) | CIV. 09-5074-JLV |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| BELLE STARR SALOON & | ) | DENYING MOTION FOR |
| CASINO, INC.; ANGIE'S INC.; | ) | PARTIAL SUMMARY |
| | ) | JUDGMENT |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THOMAS W. SHERWOOD, SR., | ) | |
| d/b/a  Sherwood Investments & | ) | |
| Trust Company, and | ) | |
| SHERWOOD FAMILY LIMITED | ) | |
| PARTNERSHIP, | ) | |
| | ) | |
| Defendants/Third-Party | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| JASON ORELUP, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

*****************************************************************************



CHELSEA LINTON,                        )        CIV. 09-5099-JLV
                                       )
          Plaintiff,                   )
                                       )
     vs.                               )
                                       )
ANGIE'S INC.; BELLE STARR              )
SALOON & CASINO, INC.;                 )
                                       )
          Defendants,                  )
                                       )
     and                               )
                                       )
THOMAS W. SHERWOOD SR.,                )
d/b/a Sherwood Investments             )
and Trust Company, and                 )
SHERWOOD FAMILY LIMITED                )
PARTNERSHIP,                           )
                                       )
          Defendants/Cross             )
          Claim Plaintiffs,            )
                                       )
     vs.                               )
                                       )
JASON ORELUP,                          )
                                       )
          Defendant/Cross Claim        )
          Defendant.                   )

## INTRODUCTION

In this consolidated action, plaintiff Misty N. Heil filed an amended complaint.  (Docket 39).  In that complaint Ms. Heil asserted claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, the South Dakota Human Relations Act of 1972, SDCL Chap. 2-13, and South Dakota common law tort claims.  Id.   The tort claims are count four: assault and battery; and count five: intentional infliction of emotional

2

distress ("IIED").  Id. at pp. 10-11.  Defendant Sherwood Investment and Trust Company ("SITC") filed a motion for partial summary judgment ("summary judgment") as to both tort claims.  (Docket 109).[1]  SITC asserts the claims "are precluded by the exclusive remedy under South Dakota's worker's compensation laws."  Id. at p. 1.

SITC filed a statement of undisputed material facts ("DSUMF") in support of its motion for summary judgment.  (Docket 111).  Ms. Heil filed plaintiff's responses to the DSUMF ("plaintiff's responses") and plaintiff's statement of material facts ("PSMF") in opposition to the motion.  (Dockets 117 & 118).  For the reasons stated below, SITC's motion for partial summary judgment is denied.

## STANDARD OF REVIEW

A party is entitled to summary judgment if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in the pleadings, but rather must produce affirmative evidence setting forth specific facts showing that a genuine issue of material fact exists.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment.  Id. at

---

[1]Ms. Heil filed a second amended complaint which re-alleged the allegations of the assault and battery and IIED claims.  (Docket 121 at pp. 11-13).  For clarity, the court will cite to the second amended complaint.

248. Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247-48 (emphasis in original).

If a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate.  Id.  However, the moving party is entitled to judgment as a matter of law if the nonmoving party fails to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In such a case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id.

In determining whether summary judgment should issue, the facts and inferences from those facts must be viewed in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  The key inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

"A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its

resolution affects the outcome of the case." Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011) (citing Anderson, 477 U.S. at 252).

## STATEMENT OF FACTS

The following facts and all inferences from those facts will be stated in the light most favorable to Ms. Heil, the nonmoving party.[2] Matsushita Elec. Indus. Co., 475 U.S. at 587-88.

Ms. Heil worked as a cocktail waitress at the Belle Starr Saloon & Casino, Inc. ("Belle Starr"). (Docket 111 at ¶ 1). She first worked at Belle Starr from February 2007 until October 2007, and then returned in February of 2008. Id. at ¶ 2. Thomas Sherwood, Jr. ("Tom Jr.") owned the stock of Belle Starr and Angie's, Inc. ("Angie's"). Id. at ¶ 10. Tom Sherwood, Sr. ("Tom Sr.") and Tom Jr. (jointly "Sherwoods") indicated they were the owners of Belle Starr. (Docket 117 at ¶ 1).

Jason Orelup worked as a manager at Belle Starr and supervised Ms. Heil during both employment periods. (Docket 111 at ¶ 3). Mr. Orelup reported to Terry Blood.[3] Id. at ¶ 4. Tom Sr. was more involved in the operation of Belle Starr than Mr. Blood. (Docket 117 at ¶ 4). Mr. Orelup was required to call Tom Sr. before firing any employee, ordering liquor, or getting cash for the tills. Id. at ¶ 5.

---

[2]Plaintiff objected to only four of the DSUMF. See Docket 118. All references will be to DSUMF, except where plaintiff's responses require otherwise, and to PSMF.

[3]Mr. Blood lived in Denver, Colorado. (Docket 104-6 at ¶ 2).

Jeremy Cease owned Presidential Limousine Service which provided limousine service to Belle Starr from 2007 to 2008.  Id. at ¶ 2.  Mr. Cease's limousine service contract was on Sherwood business letterhead.  Id. at ¶ 3. Tom Sr. provided Mr. Cease with his card and phone numbers and told Mr. Cease to call if any problems occurred at the Belle Starr.  (Docket 117 at ¶ 6).

Sherwoods came to Rapid City and went to the Belle Starr on four or five different occasions.[4]  (Docket 104-4 at ¶ 9).  The first time Tom Sr. came alone to South Dakota, he and Mr. Orelup used Mr. Cease's limousine service to go to Deadwood.  Id. at ¶ 12.  During the trip, Mr. Cease observed both Tom Sr. and Mr. Orelup grabbing and groping five or six female Belle Starr employees in the limousine.  Id.

Mr. Cease observed both Tom Sr. and Tom Jr. grabbing and groping Belle Starr employees.  (Docket 117 at ¶ 25).  On one occasion, Mr. Cease observed Sherwoods demand two female employees get into the limousine to go to Deadwood to party.  (Docket 104-4 at ¶ 14).  When the employees refused, Tom Sr. fired the women on the spot.  Id.  Sherwoods both observed Mr. Orelup grab and grope female employees, but did nothing to prevent the sexual abuse.  (Docket 117 at ¶ 26).

Sherwoods had internet video access to observe the tills and other areas in the Belle Starr.  Id. at ¶ 19.  Mr. Orelup told Mr. Cease the Sherwoods would call and yell at Mr. Orelup based on what they had seen

---

[4]Sherwoods lived in Pennsylvania.  (Docket 104-6 at ¶ 12).

6

over the internet video feed.  Id. at ¶ 20.  One time after watching the video feed Tom Sr. called and instructed Mr. Orelup to fire an employee he observed stealing from the till.  Id. at ¶ 21.  One night Mr. Orelup was loading Belle Starr liquor into a limousine when Tom Sr. called to report that over the internet video he observed Mr. Orelup taking liquor.  Id. at ¶ 22.

Sometime in 2007, Mr. Orelup used a towel to leave a welt on Ms. Heil's leg while she was working.  (Docket 111 at ¶ 5).  He also pushed her onto a pool table.  Id. at ¶ 6.  Ms. Heil did not report this assault to anyone at work nor did she go to the doctor.[5]  Id. at ¶ 7.  She quit working at the Belle Star in October of 2007.  Id. at ¶ 8.

Christine Reib worked at the Belle Starr from September 19, 2007, until February 7, 2008.  (Docket 119-4 at 52:14-16).[6]  Mr. Orelup engaged in uninvited physical contact with Ms. Reib.  (Docket 117 at ¶ 38).  He groped her in the chest and crotch areas.  Id. at ¶ 37.  Ms. Reib complained to Mr. Blood about Mr. Orelup sexually harassing her.  Id. at ¶¶ 7 & 34.  Mr. Blood instructed Ms. Reib to gather witness statements.  Id. at ¶ 7.  Mr. Blood did not conduct any personal investigation or talk with any of the employees about her complaint.  Id. at ¶ 8.  His investigation of Ms. Reib's claim was to talk with Mr. Orelup and read two written statements

---

[5]Ms. Heil reported this 2007 incident to her mother and a friend, Scarlett Via.  (Docket 118 at ¶ 7).

[6]When citing to a deposition transcript, the court will first cite to the document filed in CM/ECF and then to the page and lines of the transcript.

provided by Mr. Orelup.  Id. at ¶ 9; see also Docket 119-1 at 59:4-7.  There were no repercussions to Mr. Orelup because of Ms. Reib's complaint, aside from Mr. Blood reiterating the rules and warning Mr. Orelup any future violations would result in a reprimand.  (Docket 117 at ¶ 10).

The day before Ms. Reib was fired she found a list of phone numbers on Mr. Orelup's desk.  Id. at ¶ 15.  One of the numbers was for Sherwood Enterprises.  Id.  She called that number and left a voice mail complaining about Mr. Orelup sexually harassing her.  Id. at ¶ 16.  In her message, Ms. Reib stated she had obtained paperwork from the State to fill out on her claim of sexual harassment and that she would help other women fill out the paperwork.  Id. at ¶ 17.

Mr. Blood testified an employer should protect its employees from physical, verbal, and sexual abuse and provide an environment free of sexual harassment.  Id. at ¶ 14.  Mr. Blood did not inform the female employees at Belle Starr that any claim of sexual harassment would be fully investigated and no retaliation would result from submitting a claim.  Id. at ¶ 13.  Mr. Blood received three complaints about Mr. Orelup sexually harassing female employees.  Id. at ¶ 11.  Neither Mr. Blood nor Tom. Jr. investigated any of the complaints.  Id. at ¶ 12.

Mr. Cease observed Mr. Orelup's sexual behavior occurring all the time.  Id. at ¶ 34.  Mr. Cease observed Mr. Orelup groping an employee, Ms. Linton, and telling her to take off her shirt and pants.  Id. at ¶ 30.  Mr. Orelup poured a bottle of liquor down her shirt so he could take her shirt

8

off.  Id. at ¶ 31.  Mr. Crease also observed Mr. Orelup approach a female employee and ask for sexual favors.  Id. at ¶ 32.  When she refused, he shoved her to the floor in his office.  Id.  Mr. Orelup asked another female employee for sexual favors several different times, groped her, and eventually fired her for refusing him.  Id. at ¶ 33.  When Mr. Cease approached Mr. Orelup to discuss his behavior, Mr. Orelup assaulted him. Id. at ¶ 35.

Ms. Heil returned to work at the Belle Star in February of 2008. (Docket 111 at ¶ 9).  She knew Mr. Orelup would be there, but she returned to work "[b]ecause I felt like I would be okay."  Id.  She thought it would be alright because a friend, Rhonda Graff,[7] would be there to protect her and Ms. Heil needed the money.  (Docket 117 at ¶ 44).

Ms. Graff posted Mr. Blood's Denver telephone number in the dressing room so the female employees could make confidential complaints to him.  (Docket 104-6 at ¶ 25).  Ms. Graff observed Mr. Orelup getting drunk at work, throwing chairs, grabbing and groping and being verbally and physically abusive toward female employees.  Id. at ¶ 30; see also Docket 117 at ¶ 24.  Ms. Graff observed that if an employee played around with Mr. Orelup and allowed him to flirt, grope and grab, and provide him with sexual favors, the employee was then allowed to give away free drinks and take home between $600-$700 in tips a night.  (Docket 117 at ¶ 27).  If

_____

[7]Ms. Graff worked as a bouncer at the Belle Starr from the fall of 2006 to April 2008.  (Docket 104-6 at ¶ 1).

an employee resisted Mr. Orelup's conduct, the employee's income would be affected.  Id.

Mr. Orelup grabbed Ms. Graff and thrust his crotch into her backside when she was bent over.  Id. at ¶ 28.  On another occasion, he attempted to grab Ms. Graff's chest.  Id. at ¶ 29.  Ms. Graff also observed Mr. Orelup enter the women's dressing room.  Id. at ¶ 36.  After which an employee, Ms. DeRoco, said Mr. Orelup cornered her and groped her in the dressing room.  Id.  On several occasions Mr. Orelup grabbed the breasts of Sara Tritsma, another female employee, even though she asked him to stop.  Id. at ¶ 39.  Mr. Orelup also grabbed the crotch area of another employee, Rachel Walker.  Id. at ¶ 40.  Three former employees called Ms. Graff to report they had been groped more by the manager, Mr. Orelup, than by the customers of the "gentleman's club."  Id. at ¶ 42.  Ms. Graff testified that a number of dancers quit due to Mr. Orelup's behavior.  Id. at ¶ 41.

Ms. Graff called Mr. Blood in Denver on several occasions to report Mr. Orelup's conduct toward female employees.  (Docket 104-6 at ¶ 2).  She left voice mails and messages with the secretary.  Id.  Mr. Blood never responded to Ms. Graff's calls.  Id.  Whenever an employee called Mr. Blood, Mr. Orelup would be notified.  (Docket 104-6 at ¶ 25).  Mr. Orelup would then confront the employee.  Id.

Ms. Heil testified Mr. Orelup began sexually harassing her in late February 2008.  (Docket 111 at ¶ 14).  In February of 2008, Sherwoods visited the Belle Starr.  Id. at ¶ 11.  During this visit, Tom Jr. provided Ms.

Heil with a card containing his cell phone number and told her if she ever needed anything to call him.  Id. at ¶ 12.  Ms. Heil saved the card.  Id. at ¶ 13.

On April 25, 2008, while Ms. Heil was working at the Belle Starr, Mr. Orelup assaulted her.  Id. at ¶ 15.  He touched Ms. Heil twice between the legs and attempted to touch her a third time, but she fought him off.  (Dockets 111 at ¶ 17 & 117 at ¶ 45).  He also grabbed her arms and threw or "chucked" her to the ground.  (Docket 111 at ¶ 18).  As a result of the assault, Ms. Heil had tears "coming out of [her] eyes because [Orelup] hurt [her]."  Id. at ¶ 19.  This assault occurred between 10 and 11 p.m.  Id. at ¶ 20.  Later in the evening, Mr. Orelup tackled Ms. Heil.  Id. at ¶ 21.  She landed on a chair, hurting her back and legs.  Id. at ¶ 22.  She continued with her clean-up work, then clocked out at 2:20 a.m. and promptly left.  Id. at ¶¶ 20 & 23.

Ms. Heil reported for work the next day, April 26, 2008, and worked a full shift.  Id. at ¶ 24.  She did not want to go to work, but needed money for her daughter's birthday.  (Docket 117 at ¶ 46.)  On April 28, 2008, Ms. Heil reported the assault to the police.  (Dockets 111 at ¶ 25 & 117 at ¶ 47).

A few days after Ms. Heil's assault, Mr. Cease was in the office while Mr. Orelup was on the phone with Tom Sr.  (Docket 117 at ¶ 23).  Mr. Orelup told Mr. Cease that Tom Sr. had instructed Mr. Orelup to "get rid of anything that I have done."  Id.  About a week after the assault, Ms. Heil reported the assault to Tom Jr.  Id. at ¶ 47.  Ms. Heil signed a worker's

compensation First Report of Injury on April 20, 2009, claiming she suffered a work-related injury on April 25, 2008.  (Docket 111 at ¶ 31).

She alleges Mr. Orelup was acting within the scope of his employment at the time of the assault and SITC was her employer at the time of the assault.  Id. at ¶ 33.  Ms. Heil alleges she suffered severe emotional distress as a result of the assault by Mr. Orelup.  Id. at ¶ 26.  Ms. Heil alleges she was depressed, taking medication, experiencing nightmares, and was "messed [] up pretty good."  Id. at ¶ 27.  She alleges her condition was caused by Mr. Orelup's physical assault.  Id. at ¶ 28.  She alleges Mr. Orelup's conduct was extreme and outrageous, which "intentionally and/or recklessly" caused her severe emotional distress.  Id. at ¶ 30.  These physical and emotional claims are alleged generally in the amended complaint.[8]  (Docket 121 at pp. 11-13).

## DISCUSSION

SITC filed its motion for partial summary judgment arguing Ms. Heil's assault and battery and IIED "claims are barred by the exclusive remedy provision of the South Dakota worker's compensation law."  (Docket 112 at p. 4).  South Dakota's exclusive remedy provision of its worker's compensation law is found at SDCL § 62-3-2.  That statute provides:

> The rights and remedies granted to an employee subject to this title, on account of personal injury . . . arising out of and in the course of employment, shall exclude all other rights and remedies of the employee . . . on account of such injury . . . against the

_____

[8]Although not a fact material to the motion for summary judgment, Ms. Heil did not sue Mr. Orelup.  (Docket 111 at ¶ 32).

employer or any employee, partner, officer, or director of the
employer, except rights and remedies arising from intentional tort.

Id. The ultimate question in resolving the summary judgment motion is
whether this exclusive remedy provision is applicable to this case because of
the exception found at the end of the statute–"except rights and remedies
arising from intentional tort." Id.

By their nature, claims of assault and battery and IIED are
intentional torts as they require intentional conduct, as opposed to mere
negligence. "The claim of civil assault and battery can be proved if the
defendant: (a) intended to cause a harmful or offensive contact with the
person of the other or a third person, or an imminent apprehension of such
a contact; and, (b) an offensive contact with the person of the other directly
or indirectly results." Stratmeyer v. Engberg, 649 N.W.2d 921, 925-26 (S.D.
2002) (internal bracketing and citations omitted). "[T]he victim need not
show a specific intent or design to cause the contact or to cause any
singular and intended harm. What is forbidden is the intent to bring about
the result which invades another's interests in a manner that the law
forbids." Id. at 926 (internal citation omitted). "The claim of intentional
infliction of emotional distress requires the following elements: (1) extreme
and outrageous conduct by the defendant; (2) that the defendant intended
to cause severe emotional distress; (3) there must be a causal connection
between the wrongful conduct and the emotional distress; and (4) severe

13

emotional distress must result." Id. (internal quotation marks and citations omitted).

The South Dakota Supreme Court concluded "it is not enough simply to use the right terminology [to] invok[e] the intentional tort exception." Jensen v. Sport Bowl, Inc., 469 N.W.2d 370, 372 (S.D. 1991). Plaintiff "must also allege *facts* that plausibly demonstrate an actual intent by the employer to injure or a substantial certainty that injury will be the inevitable outcome of employer's conduct." Id. (emphasis in original). It is not enough that an "employer[] act[s] or fail[s] to act with a conscious realization that injury is a *probable* result . . . . To establish intentional conduct [to come within the exception to the exclusivity provision] *more than the knowledge and appreciation of risk is necessary*; the known danger must become a *substantial certainty*." Id. (citing VerBouwens v. Hamm Wood Products, 334 N.W.2d 874, 876 (S.D. 1983), *overruled on other grounds*, Holscher v. Valley Queen Cheese Factory, 713 N.W.2d 555 (S.D. 2006) (emphasis in original, brackets and ellipsis omitted). "Even when employers act or fail to act with a conscious realization that injury is a *probable* result, worker's compensation is still the exclusive remedy for workers thereby injured." Harn v. Continental Lumber Co., 506 N.W.2d 91, 95 (S.D. 1993) (citing Jensen, 469 N.W.2d at 372 and VerBouwens, 334 N.W.2d at 876) (emphasis in original, internal quotation marks and ellipsis omitted). To

14

come within the worker's compensation intentional tort exception, "[i]ntentional tortious conduct is when an ordinary, reasonable, prudent person would believe an injury was substantially certain to result from his conduct. To establish intentional conduct, more than the knowledge and appreciation of risk is necessary; the known danger must cease to become only a foreseeable risk which an ordinary, reasonable, prudent person would avoid (ordinary negligence) and become a substantial certainty." Id. at 97.

When a corporate manager is the supervisor charged with a physical assault against another employee, the South Dakota Supreme Court applies a very narrow construction of the intentional tort exception to the worker's compensation exclusivity. "[T]o find [the corporation] vicariously liable for the acts of its supervisor in the absence of notice, [supervisor] Goble must have been 'so dominant in the corporation that he could be deemed the alter ego of the corporation under the ordinary standards governing disregard of corporate entity.'" Benson v. Goble, 593 N.W.2d 402, 406 (S.D. 1999) (citing 6 Larson, Workers' Compensation Law § 68.22 at 13-130 (1998)). "In the present case, Benson has failed to allege facts sufficient to establish Goble as an alter ego personality of the corporation. Goble was merely a supervisor. He simply was not so dominant in the corporation to be deemed its alter ego." Id.

In <u>Benson</u>, the corporation knew "Goble had two previous sexual harassment complaints filed against him in addition to Benson's [physical] assault complaint.  [The corporation] also knew Goble had a 'policemen-type' method of supervising employees."  <u>Id.</u> at 407. Notwithstanding this corporate knowledge, the court concluded "[b]ased on this record, Benson has failed to show that [the corporation] knew or believed that harm was substantially certain to be the consequence of retaining Goble as a supervisor."  <u>Id.</u>  "In the present case, viewing the evidence and the pleadings in a light most favorable to Benson's case, the facts are insufficient to demonstrate with a substantial certainty that injury would be the inevitable outcome."  <u>Id.</u>

The most recent South Dakota Supreme Court case to expand the exclusivity of the worker's compensation provision is <u>Fryer v. Kranz</u>, 616 N.W.2d 102 (S.D. 2000).  <u>Fryer</u> was not a physical assault case, but rather involved use of a dangerous product.  "To show Fryer how to clean the tile, Kranz poured the undiluted muriatic acid on the floor, saying 'This is how we use it.'  Kranz said he had used the product several times.  He did not warn Fryer about any dangers, although he did say the acid is 'corrosive and smells really bad,' and 'try not to breathe it.' "  <u>Id.</u> at 104.  When Fryer used the muriatic acid in a non-ventilated room, she became ill and was hospitalized for four days.  <u>Id.</u>  In her lawsuit, Ms. Fryer alleged her

16

employer "intentionally caused the plaintiff to be exposed to the dangerous situation knowing that it was probable that serious injury would result." Id.

The Supreme Court affirmed the trial court's grant of summary judgment under the exclusivity of worker's compensation but in performing the substantial certainty analysis interjected "virtual certainty" into the process. "To overcome Kranz's motion for summary judgment, Fryer needed to show that Kranz knew with *virtual certainty* that such exposure *would* cause illness, yet still required her to work. . . . This she failed to do." Id. at 108 (citing Harn, 596 N.W.2d at 100) (emphasis in original).

In Fryer, two Supreme Court Justices disapproved of the use of the phrase "virtual certainty." " 'Virtual certainty' should not be used to increase the 'substantial certainty' test.  The majority opinion confusingly leaves the bench and bar to wrestle with any possible implications and reaches the wrong decision by use of such test." Id. at 109 (Sabers, J., dissenting).  "The term 'virtual certainty,' used repeatedly in the majority writing, somehow crept into our precedent, but its lineage is obscure. . . . In human behavior few things are 'virtually certain' to follow any particular deed.  The intentional tort exception should be narrowly construed, of course, but not to the extent of requiring proof that employers must foresee with 'virtual certainty' the results of their deliberate acts. . . . Substantial

certainty is the appropriate standard." Id. at 111 (Konenkamp, J., dissenting) (internal citation omitted).

In a subsequent case involving SDCL § 62-3-2, South Dakota Supreme Court Justice Zinter stated, "[a]s Justice Konenkamp points out, our cases have utilized a 'substantial certainty' standard and a 'virtual certainty' standard. . . . Even if it were time to reconcile that conflict, I would wait for a more appropriate case to do so.  In this case, not only did the Court apply the 'substantial certainty' standard, but McMillin has not argued that Harn and Kranz should be reversed.  Therefore, I would not re-examine those cases until this conflict has been fully briefed and argued." McMillin v. Mueller, 695 N.W.2d 217, 225 (S.D. 2005).

SITC argues when plaintiff's view of the facts in this case are evaluated under the "substantial certainty" standard, Ms. Heil cannot prevail on either her assault and battery or IIED claim.  "Construing all facts in a light most favorable to Heil, one could presume an employer knew about the alleged sexual harassment of another employee (Reib), but there is no evidence that the Belle Starr, [Tom]Jr., or even SITC was substantially certain that Heil would be harmed."  (Docket 112 at p. 8).

This case is distinctly different from the factual settings in Benson and Pickett v. Colonel of Spearfish, 209 F. Supp. 2d 999 (D.S.D. 2001).   In Benson, the employer sought to control the supervisor's abusive conduct.

18

"Benson reported [the] incident to the personnel manager and to Goble's supervisor. . . . Goble was suspended without pay for two weeks and required to attend anger-management counseling." Benson, 593 N.W.2d at 404.  Following his suspension and upon returning to work, Goble assaulted Benson again.  Id.  "Based on this record, Benson has failed to show that [the corporation] knew or believed that harm was substantially certain to be the consequence of retaining Goble as a supervisor." Id. at 407.

In Pickett, the offending employee, Mr. Jones, was previously accused of sexual harassment of two female employees.  Pickett, 209 F. Supp. 2d at 1002.   The owner "investigated the incidents and caused a reprimand to be given to Jones." Id.  Later, Ms. Pickett alleged Mr. Jones sexually harassed and eventually raped her.  Id.  The court concluded "there is no evidence that either owner knew or could have known of the alleged incidents. . . . Pickett did not follow the proper procedure to place either owner of the Colonel on notice of any harassment . . . ." Id. at 1005.  "South Dakota state law bars these claims and this Court must abide by the state law in which it sits.  While [one of the owners] knew of the prior alleged sexual harassment Jones had committed upon [the two other employees], neither partner could be substantially certain that harm would come to Pickett. . . .

19

The controlling law in this state is set forth in <u>Benson</u> and this Court finds this action to be nearly perfectly analogous to that action, therefore, this Court reaches the identical result." <u>Id.</u>

Without restating all the facts set out above, the court finds a genuine issue of material fact exists which precludes partial summary judgment. <u>Anderson</u>, 477 U.S. at 248.  Not only did SITC know of the prior sexual harassment of Ms. Reib but, through Mr. Blood, SITC was aware of Mr. Orelup's sexual harassment and physical abuse of numerous other female employees.  Also,  by video surveillance of the Belle Starr, Sherwoods were privy to the daily activities of Mr. Orelup.  Sherwoods were also personally present at the Belle Starr when Mr. Orelup groped and grabbed female employees.  Yet, Sherwoods did nothing to prevent his conduct.  SITC was not in the dark about Mr. Orelup's ongoing improper conduct.

This case also is different from <u>Benson</u> and <u>Pickett</u> in that Sherwoods were personally engaged in conduct which a jury could view as sexual harassment or sexual abuse.  A jury could reasonably conclude Sherwoods endorsed, condoned, and encouraged the physical and sexual abuse of their employees by Mr. Orelup.  At no time did SITC take any affirmative action to control Mr. Orelup's conduct.  A jury reasonably could conclude Tom Sr., Tom Jr., and SITC knew Mr. Orelup's physical and sexual abuse of the

female employees went beyond being a probable risk and had "become a substantial certainty."  <u>Harn</u>, 506 N.W.2d at 95.

Viewing the evidence in the light most favorable to Ms. Heil for summary judgment purposes, a jury could find the course and pattern of conduct at the Belle Starr was substantially certain to cause an assault or IIED of female employees, including Ms. Heil.  It is ultimately a question of fact for the jury to determine whether the evidence satisfies the substantial certainty standard.  Only then can the court determine if Ms. Heil's intentional tort claims are excepted from the exclusivity provision of SDCL § 62-3-2.

## ORDER

Based on the above discussion, it is hereby

ORDERED that defendant's motion for partial summary judgment (Docket 109) is denied.

Dated March 11, 2013.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
CHIEF JUDGE